EARL FRED MIDDLETON *v.* STATE
OF MARYLAND

[No. 208, September Term, 1968.]

*Decided March 19, 1969.*

*Carville M. Downes* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were

*Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Clewell Howell, Jr.,* and *John J. Lucas, Assistant State's Attorneys for Baltimore County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Appellant was convicted by the court sitting without a jury of assault with intent to rape and murder in the first degree and sentenced to a life term under the jurisdiction of the Department of Correction. He contends on this appeal that the evidence was insufficient to support the convictions.

The nude body of Catherine Kantros was discovered in an open field located near the Beltway in Baltimore County on the morning of November 29, 1967. An autopsy was performed which indicated that numerous lacerations about the face and head of the victim had been inflicted shortly prior to or at the time of death, and that death occurred from loss of blood due to multiple stab wounds in her back and neck. The victim's clothing, consisting of a pair of boots, red pants, and black panties, was discovered scattered alongside the roadway near John Avenue, that location being about one and four-tenth mile from where the deceased was found.

William Effinger testified at the trial that at approximately 5:00 p.m. on November 28, 1967, he was parked in a white Valiant automobile in an alley behind the Carousel Lounge in Baltimore City, with Cathy Kantros, appellant, Garson Jackson and Romero Wright, the latter being the driver of the vehicle; that the others walked away from the automobile leaving Cathy and appellant in the back seat, Wright informing the others that appellant would attempt to "have sexual intercourse with Cathy and that if he did we all would"; that Cathy was "fairly drunk" when they returned to the automobile a short time later with a bottle of liquor; that Cathy threw the bottle to the pavement and began screaming that she would not retrieve it, and saying "let me go"; that because she was so noisy they drove from the area, with Cathy continuing to scream and attempting to leave the automobile, and appellant restraining her and slapping her face until she "passed out"; and that they continued

driving until they reached an unfamiliar field located near "something like John Street, Johns Avenue," where they parked.

Effinger further testified that by the time they had stopped, appellant already had pulled Cathy's sweater up so that it covered her face; that Wright pulled her boots and slacks off as appellant took her blouse and bra off; that some of Cathy's clothing was left in the back of the automobile, while some was discarded outside; that they left appellant alone in the automobile with Cathy, but returned when they thought they saw another automobile approaching; that he (Effinger) observed that Cathy still appeared unconscious and appellant "was laying on top of her" and "it looked like he was moving, he was moving his body"; that they drove a short distance away and again all except Cathy and the appellant left the car until they heard appellant yell "ow, you bitch, you bit me," and Cathy screaming; that appellant began striking her, and when her screams became louder, Jackson struck her until she could only make a "gargling sound" due to the blood coming from her mouth; and that they again left the automobile in order for appellant "to talk" to Cathy, returning thereafter three times until Wright declared that "we can't wait any longer." Effinger testified that Jackson then dragged Cathy from the automobile, remarking to appellant upon his return a short while later that "you've got a dull knife, I had to use both hands."

Charles Lentini testified that between 8:00 p.m. and 9:00 p.m. on November 28, he was picked up in a white Valiant automobile driven by Wright and in which appellant, Jackson and Effinger were passengers; and that Wright said "the heat is on, now we're involved in two murders * * * the nigger and a girl." Noticing that appellant was silent and stared out the window while holding a hunting knife, Lentini inquired about him and Wright stated that "he's upset about having to bust that girl," to which Jackson added, "but at least he got some, we didn't"; and that Jackson also said "you should have heard the sound of the knife, thump, thump" and that "I had to use two hands, the blade wasn't sharp enough."

Lentini testified that appellant produced a white dress shirt covered with blood, which he refused to surrender to anyone, claiming that "no one's touching it"; that they then found a purse

384

in the car, and Wright declared "this is the only connection be-
tween us and this girl," and he stopped the automobile and
dropped it down a sewer.

Appellant testified that on the day in question he was riding
in an automobile with Jackson, Wright and Effinger, when they
saw Cathy Kantros, and that Jackson, who knew her, invited
her to go with them; that after they had consumed several half-
pints of liquor and shot some pool, he entered the back seat of
the automobile and began "making out" with Cathy without any
resistance on her part; that they had an argument over her
throwing a liquor bottle on the pavement, and he slapped her;
that she was hollering at Wright and they left because she was
making too much noise; that while they were driving out of
the city they were kissing and fondling each other; that when
the automobile stopped Cathy was fully clothed and he asked
her to have intercourse with him; that with Cathy's assistance
Wright undressed her from the waist down and thereafter he
(appellant) and Cathy were left alone in the automobile; that
she was fully clothed from the waist up when he had inter-
course with her; that the others returned and they drove to a
location nearby where Cathy bit him (appellant), and he hit
her once with his fist; that she began screaming and Jackson
struck her with his fist; that she was bleeding profusely and he
(appellant) pulled her toward him, telling the others "to get
the hell away from here"; that they left when he told them he
would attempt to revive her and talk to her; and that they re-
turned saying it was "taking too much time" and Wright held
him while Jackson pulled the girl from the automobile and
stabbed her. Appellant testified that he tried to restrain Jack-
son, but was unable to do so, and was told that "if I didn't want
to join her, shut up."

The court found from the evidence that it was the intention of
appellant and his companions to have sexual relations with
Cathy; that from her actions, and those of appellant and his com-
panions, Cathy did not consent thereto; that while the evidence
was insufficient to establish penetration and hence rape, it did
disclose that appellant assaulted the victim with intent to rape
her, particularly since it was shown that Cathy was undressed
and unconscious when appellant was lying on top of her in the

car; and that while "the actual assault with intent to rape by Middleton [appellant] was over and done with before Jackson actually stabbed the girl on numerous occasions, causing her death * * * the action of Jackson was so related in time and place to the felony [of assault with intent to rape] committed by Middleton, and its purpose was also connected with the crime, the doctrine of felony-murder is applicable and justifies a finding of guilty of murder in the first degree, even though Middleton didn't intend to kill her, didn't want her killed, and did not in fact kill her" since "[e]ven an unintentional, an unplanned, an unparticipated-in death that occurs in the course of a felony is, by statutory definition, murder in the first degree." In convicting appellant of assault with intent to rape, and first degree murder, the court found that Effinger's testimony was credible and that it was corroborated by the testimony of Lentini as well as by that of the appellant himself.

Appellant contends that to sustain his murder conviction under the felony murder doctrine utilized by the lower court, the evidence must be legally sufficient to support the underlying conviction of assault with intent to rape; and that there must be corroboration of the testimony of the accomplice Effinger legally sufficient to independently establish the *corpus delicti* of the alleged assault with intent to rape Cathy Kantros. More specifically, appellant maintains that the only corroborative testimony presented was of Lentini and himself, but neither corroborated any material points of Effinger's testimony tending to prove that Cathy was ever assaulted by anybody with intent to rape; and this being so, he urges that a reversal of the assault charge is required which, in turn, dictates a reversal of the murder conviction, as it was predicated solely on the commission of the felonious assault.

By Maryland Code, Article 27, Section 410, "All murder which shall be committed in the perpetration of, or *attempt* to perpetrate any rape * * * shall be murder in the first degree." Appellant was convicted of assault with intent to rape in violation of Section 12 of Article 27, the indictment specifying that he "feloniously did make an assault" in and upon Miss Kantros "with intent then and there feloniously to ravish and carnally know her, forcibly and against her will." The essential in-

gredients of the crime of assault with intent to rape are (a) an assault, (b) an intention to have carnal knowledge of a female, and (c) a purpose to carry into effect this intention with force and against the consent of the female. *Wharton's Criminal Law and Procedure*, (Anderson Edition) Section 323; 75 C.J.S. *Rape,* Section 20. See also *Waters v. State,* 2 Md. App. 216. Whatever differences may exist between an attempt to commit a rape and an assault with intent to commit that crime (see Clark & Marshall *Crimes* (6th Edition) Section 4.07), we think an aggravated assault with the intention of committing rape may also constitute an attempt to commit that crime within the purview of Section 410. In *Weinecke v. State,* 188 Md. 172, 177, it was held that to constitute the crime of assault with intent to rape, "the proof must establish, beyond a reasonable doubt, that the *attempt* was committed with force." In *Bryant v. State,* 4 Md. App. 572, 577, a case involving a charge of assault with intent to rob under Section 12, we held that the crime was "an aggravated assault requiring a specified intention in addition to the intentional doing of the *actus reus* itself," and in *Brooks v. State,* 2 Md. App. 291, we held that an assault with intent to rob may also constitute an attempted robbery within the contemplation and meaning of Section 410.

We think that Effinger's testimony clearly established that appellant assaulted Cathy with the intent to rape her and that the circumstances were such that the assault amounted to an "attempt" to perpetrate a rape within the ambit of Section 410. According to Effinger's testimony, appellant was lying on top of Cathy, moving his body, at a time when Cathy was unconscious and unclothed; he struck her and restrained her from escaping from the car; she screamed and bit him; and her clothing was eventually thrown out of the car. The fact that appellant himself testified that he actually had intercourse with Cathy does not mean that the trier of fact could not properly convict him of the lesser crime of assault with intent to rape, particularly since the autopsy report did not indicate penetration, while it did show injury to the external genitalia. See *Farrow v. State,* 233 Md. 526, where, despite the victim's testimony that she was in fact raped, a conviction for assault with intent to rape was upheld in view of the medical testimony that there was no evidence of spermatozoa or penetration.

As the testimony of Effinger thus showed that appellant assaulted Miss Kantros with intent to rape her under circumstances bringing the crime within the felony-murder provisions of Section 410, the only remaining question is whether Effinger's testimony was sufficiently corroborated since, as Effinger was an accomplice, the conviction of appellant for assault with intent to rape could not be founded solely upon Effinger's uncorroborated testimony. See *Veney v. State,* 251 Md. 159, 168-169; *Hopkins v. State,* 5 Md. App. 284, 287. As a general rule, evidence corroborating the testimony of an accomplice is not sufficient if it merely shows the commission of the offense or the circumstances thereof; it must support some of the material facts which tend to show that the accused was either identified with the perpetrators of the crime or had participated in the commission of the crime itself. *Boone v. State,* 3 Md. App. 11, 17-20, and cases there cited. As so forcefully stated in *Watson v. State,* 208 Md. 210, 217, "[t]he reason for the rule requiring the testimony of an accomplice to be corroborated is that it is the testimony of a person admittedly contaminated with guilt, who admits his participation in the crime for which he particularly blames the defendant, and it should be regarded with great suspicion and caution, because otherwise the life or liberty of an innocent person might be taken away by a witness who makes the accusation either to gratify his malice or to shield himself from punishment, or in the hope of receiving clemency by turning State's evidence."

The Maryland cases reflect a wide-range of factual situations in which the legal sufficiency of the corroboration of an accomplice's testimony has been considered where the issue has been proof of the criminal agency of the accused. The cases are collected in *Boone v. State, supra,* at Footnote 4, and fall into three general classes, (a) those in which the corroborative evidence tended to identify the defendant with the perpetrators of the crime, (b) those in which the corroborative evidence tended to show the defendant's participation in the crime itself, or (c) those in which the corroborative evidence tended both to identify the defendant with the perpetrators of the crime and to show his participation in the crime itself. That there was sufficient corroborative evidence of Effinger's testimony showing ap-

pellant's involvement with Wright and Jackson in the acts resulting in Cathy's death is entirely clear. Indeed, appellant's own testimony was remarkably similar in detail to that of Effinger, the principal difference being that appellant claimed that he actually had consensual sexual relations with Cathy, while Effinger's testimony indicated an attempt to have such relations under nonconsensual circumstances. In addition, the testimony of Lentini established that appellant was in the company of Jackson, Wright and Effinger shortly after the crime, at which time they spoke of the crime, appellant had a knife in his possession, and a white shirt covered with blood. We think appellant's identification with the perpetrators of the crime and his participation in the crime itself was amply corroborated.

But as heretofore indicated, it is the gist of appellant's contention that there is no corroboration of Effinger's testimony that appellant ever committed an assault upon Cathy with intent to rape her, *viz.*, that there was no corroborative proof of the *corpus delicti* of the crime of assault with intent to rape. It has been held by some authorities that the requirement of corroborative evidence extends only to the guilt of the accused and that the *corpus delicti* may be established by the uncorroborated evidence of an accomplice, while other authorities take the position that an accomplice must be corroborated even with respect to the commission of a crime, as distinct from the connection of the accused therewith. See 23 C.J.S. *Criminal Law*, Section 812 (2) c, and cases there cited. Assuming the law of Maryland to be that an accomplice's testimony that a crime was committed must be corroborated by some independent evidence of the *corpus delicti*, we think it clear that there was such corroboration in this case. The fact that Cathy had been physically beaten about the face and head was corroborated by the autopsy report. The discovery of her nude body with injury to her external genitalia—a tearing at the vaginal entrance—indicated the likelihood of sexual attack, a conclusion fortified by the fact that her clothing was found strewn about the roadside near where her body was discovered. Appellant's own testimony that Cathy bit him, and that he struck her is corroborative of the improbability of a consensual sexual relationship, particularly in view of his admission that Wright assisted in undressing Cathy.

On the record before us, we conclude that there was sufficient corroboration of the *corpus delicti* of the crime of assault with intent to rape, as well as sufficient corroboration showing appellant's identification with the perpetrators of the crime and with the commission of the crime itself.

*Judgments affirmed.*