## ANTHONY LAMONT MOLLAR *v.* STATE OF MARYLAND

[No. 618, September Term, 1974.]

*Decided March 17, 1975.*

292

The cause was argued before POWERS and LOWE, JJ., and JOHN C. ELDRIDGE, Associate Judge of the Court of Appeals, specially assigned.

*Paul Mark Sandler, Assigned Public Defender,* with whom was *Anton J. S. Keating, Assistant Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Ronald T. Osborne, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

The question we are asked to decide is an evidentiary one relating to the identity exception to the rule excluding evidence of prior offenses. The rule was iterated by the Court of Appeals in *Wentz v. State,* 159 Md. 161, 164 and reiterated most forcefully in this Court by Chief Judge Murphy, now Chief Judge of the Court of Appeals. After reciting the general rule of exclusion, the Chief Judge turned to the exceptions which he elected to denominate rules of admissibility rather than exceptions to the rule of exclusion:

> "As more particularly crystalized in *Cothron v. State,* 138 Md. 101, 110, the rule is that evidence of other crimes is admissible to prove the specific crime charged when such evidence tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) *the identity of the person charged with the commission of the crime on trial.* To like effect, see *Jones v. State,* 4 Md. App. 445; *Thomas v. State,* 3 Md. App. 708;

*Gilchrist v. State,* 2 Md. App. 635; *Loker v. State,* 2 Md. App. 1; *Gorski v. State,* 1 Md. App. 200." [Emphasis added]. *Gordon v. State,* 5 Md. App. 291, 306, *cert. denied,* 252 Md. 730.

Although identity is regularly recited, we have not had cause in Maryland to apply the identity exception where it was the sole ground for admissibility of prior convictions. Appellant notes that C. McCormick, *Evidence* (2d ed.) § 190 at 451 cautions that identity evidence is usually linked with another exception such as motive or "larger plan" (common scheme).[1] We note that the United States Court of Appeals for the 4th Circuit interprets McCormick as saying that "the identity exception is not really an exception in its own right, but rather is spoken of as a supplementary purpose of another exception." *United States v. Woods,* 484 F. 2d at 134. As persuasive as such authority may be, we are of course not bound by federal decisions other than those of the Supreme Court interpreting provisions applicable to the states. *Wiggins v. State,* 22 Md. App. 291.

Although we may agree with McCormick's further observation "that the evidence will usually follow . . . some one or more of the other theories . . . ," we do not conclude, as did the *Woods* court, that that which usually occurs, must occur. On the contrary, we view Maryland law as in accord with 1 Wharton's *Criminal Evidence,* § 243:

> "Evidence of an independent crime is admissible when such evidence tends to aid in identifying the accused as the person who committed the crime charged."

---

1. McCormick says: "(8) To prove identity. This is accepted as one of the ultimate purposes for which evidence of other criminal conduct will be received. It is believed, however, that a need for proving identity is not ordinarily of itself a ticket to admission, but that the evidence will usually follow as an intermediate channel, some one or more of the other theories here listed." Appellant feels that Thomas v. State, 3 Md. App. 708, 713 lends support to that premise because the Court "discussed the identity exception as embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other." We do not agree with appellant that Thomas supports his premise simply because that case treated with two exceptions simultaneously, *i.e.,* identity and common scheme or plans.

To hold otherwise would render the identity exception a purposeless existence. If the evidence of prior crimes is to be admitted to prove identity only when there is another applicable exception, identity is but another windmill for Quixotic Academe, since the evidence of prior crimes would be admitted under the other exception with or without identity.

We have no quarrel, however, with appellant's argument that the probative value of the evidence should be weighed against the prejudicial [2] effect upon the jury. *Woods*, 484 F. 2d at 134 again relies upon McCormick:

> "[S]ome of the wiser opinions (especially recent ones) recognize that the problem is not merely one of pigeonholing, but one of balancing, on the one side, the actual need for the other crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility." § 190 at 448.

## Facts

If conceived by a bar examiner the case at bar could not better determine the ability of the identity exception to stand alone. The victim was a young lady accosted by appellant at gun point as she was going home at an early morning hour after having worked the night shift. She was taken to a parking lot by appellant, raped and forced to commit fallatio. He then took her to an empty garage under threat of bodily harm.

---

2. Since the purpose of all evidence by the State in a criminal case is to "prejudice" the defendant, our use of the term in its context here shall mean to connote the raising of hostility in the jury by factors not directly related to the crime at issue.

Using commendable ingenuity augmented by her instinct to survive, the victim:

> ". . . started talking to him, like I was trying to talk some sense into him . . . I always believed you could talk your way out of anything."

They discussed a number of subjects related to why he had done what he did, his social life and his life generally.

> ". . . half the time he talked like he had some sense and sometimes then he just talked real crazy like.
>
> . . .
>
> I was asking him about his life. *He was telling me that he spent most of his life in jail, he was on parole, he had been arrested before for assault, attempted murder and rape.* And that I was telling him, you know, your parents told you all your life you weren't any good, but I believe there is good in anybody. Like no matter what you do you can do what that other person tells you to do if you believe you aren't any good in your mind. I was telling him everybody is good, he should just do what he fell [sic] was right, no matter what his parents told him. Being in jail all his life he could overcome if he really wanted to. He was telling me I was the only person that talked any sense into him. All his life he heard how wrong he was, what he done. I told him I hadn't eaten anything since that afternoon. I said, how about taking me down, I knew where there was a Little Tavern on Baltimore Street. I figured if I could get there I could run, because I know there are people around there. So I said, I want my Avon. So we got out, we started walking down. He walked me way out to around —"

As they walked near the Post Office Building, the victim threw a bottle of perfume at appellant and escaped by running into the building.

Subsequently the police asked her to review photographs for the purpose of identification. She identified one as

resembling her assailant. A month later she spotted appellant in a phone booth and called the police who apprehended him. She again identified appellant in court as her assailant.

A bank security guard to whom she had waved as she was being forced to the parking lot by appellant was called to testify. Although he corroborated the time, place and male companion portions of her testimony, he was unable to identify appellant. He had not seen the male companion's face.

Appellant put on no testimony. From the thrust of his cross-examination, however, it is apparent that his defense was directed to lack of proof of criminal agency (mis-identification) rather than corpus delicti or consent. When cross-examining the victim, appellant attempted to shake the positiveness of her in-court identification by referring back to her initial attempt to identify her assailant from photographs:

> "Q Let me direct your attention, if I might, to another time when you were just as positive when Det. Holtzman asked you to come down to the Central District just an hour or so after this incident, and he showed you a number of photographs, did he not?
>
> A Yes, sir.
>
> Q Did Det. Holtzman ask you to be very deliberate when going through the photographs?
>
> A He asked me was I sure. I said no, I'm not sure, but he resembles the guy that attacked me, but I can make a positive identification if I saw him again.
>
> . . .
>
> Q Did Det. Holtzman tell you to be very deliberate and to look very carefully at those photographs, not to make an identification unless you were sure?
>
> A He told me to look at them very closely, yes, he did.

Q Did he tell you not to make an identification unless you were sure?

A He told me not to make an identification but I also told him I wasn't sure, but he favored the guy. I always emphasized that.

. . .

Q Det. Holtzman relayed to that official that you had picked out an individual from photographs?

A Yes, he did.

Q Det. Holtzman told that official that he wanted an arrest warrant, did he not?

A Yes, he did.

Q Did that court official ask you if you were positive?

A Yes. I also told him I wasn't positive, but he favored the guy.

Q And then?

A Because I know what you're trying to do too, but he's not the one I picked out.

Q I'm trying to bring out all the facts for the jury so they can make a decision. After you said whatever you said to that court official an arrest warrant was issued for Marvin Boyd Bailey, is that right?

A Yes, it is.

Q And then was there a photograph, were there any other photographs among the two hundred, two hundred and fifty photographs that looked as though they resembled your assailant?

A I guess there might have been quite a few but that's not the one I picked out." [3]

Appellant then caused her to acknowledge the rather pecular circumstance of her subsequent recognition of

---

3. Detective Holtzman testified that a warrant was received for the subject she photographically identified, but later quashed.

appellant a month later. The victim was participating in the birthday celebration of a friend at the Globe Club.

"Q And then would I be not correct if I stated all four of you went out north of Baltimore looking for ghosts, is that right?

A Yes, we went, we were at the club talking about ghosts and spooks and Laverne and her boyfriend Jimmy were saying there was this place he took her before that its foggy, its kind of eerie. They asked me would I mind going. I said no. We went out there for a ride and we got donuts and hot chocolate.

. . .

Q It was on the way back from this excursion that you saw Anthony Mollar?

A Yes.

Q Let me make one thing clear for the jury; have you ever seen Anthony Mollar?

A Not until he attacked me, no, I hadn't.

Q In any event you were going by a phone booth at Cold Spring and the Alameda, is that right?

. . .

Q And you looked over, and this is four o'clock in the morning, you saw an individual in the phone booth, is that right?

A He was out of the phone booth crossing Cold Spring Lane.

Q But you never saw his face at that time?

A No, I saw the features of him. I saw the way he walked and the characteristics of the guy that attacked me and it's the guy that attacked me."

It is enough to say that appellant's attack upon the victim's identification was both extensive and sufficiently effective to cause the prosecutor to be concerned about its effect upon the jury. The concern was evidently justified as borne out by questions later submitted by the jury during their

deliberations. Two questions which the court was not able to answer related to facets of identification raised on cross-examination.

At one point in its case in chief, the State proffered appellant's record:

"MR. OSBORNE: Your Honor, during the testimony of the victim, Miss Tisdale, she related that her assailant told her some of his background, including among other things that he had been arrested for attempted murder. He was in fact convicted on a charge of assault with intent to murder, the same thing in the lay mind. That conviction took place in 1966. We would not only offer that certified copy of the record of conviction in our case in chief at the appropriate time, but also would want to bring that out on cross-examination for the same purpose, it being circumstantial evidence tending to show that the identification, tending to prove the identification of the assailant was this defendant.

. . .

THE COURT: I'm not concerned about the impeachment. If in fact the defendant takes the witness stand I'm only concerned now about the issue do you intend by way of substantive evidence to produce the fact he was in fact convicted of assault with intent to murder and he was on parole at the time of the offense, one or both?

MR. OSBORNE: Both. We have documentation as to the assault with intent to murder. Should he take the stand we intend to bring out on cross-examination he was on parole at the time of the offense.

THE COURT: We are talking about the case in chief.

MR. OSBORNE: In the case in chief.

THE COURT: Do you intend to introduce it before you rest?

MR. OSBORNE: Yes, a certified copy of the record showing he was convicted of assault with intent to murder. We merely want to corroborate.

THE COURT: Also a certified record as to the parole at that time?

MR. OSBORNE: I do not have such a record at this time, Your Honor.

. . .

THE COURT: I'll sustain the objection as to introducing it in chief at this time, with the understanding if in fact the defendant testified you will be allowed to cross-examine as to that issue, even though he was a youth. If he does testify then I will have to concern myself with the issue as far as rebuttal testimony is concerned."

The State closed its case and appellant's motion for judgment of acquittal was denied. Instead of risking introduction of its evidence on the appellant's decision of whether to take the stand, the State moved to reopen its case:

"MR. OSBORNE: In order to present testimony from Mr. Steiner, of the Parole Department, which would indicate that this defendant, Anthony Mollar was in fact on parole status on May 11th, 1973, the date of this offense. And also to offer a certified copy of the record of conviction for the offense of assault with intent to murder. These two proffers would be made in order to tie in with the victim's testimony as to admissions as to that offense and that parole status."

The judge overruled appellant's timely objection and the evidence was introduced. However, he assiduously adhered to the admonition of Wharton, *Supra*, § 264 that "Where evidence of another crime is admitted, the trial judge must instruct the jury as to the limited purpose for which it is introduced."

"Now in this case I did allow evidence as to a

prior record of the defendant. Also I allowed evidence to be presented that the defendant was on parole on May the 11th, 1973. Now the law is clear in Maryland, I read you the general law, that when a man is put upon trial for one offense he is to be convicted, if at all, by evidence which shows that he's guilty of that offense alone and that under ordinary circumstances proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded. In other words, in lay language a man may have committed another crime and be absolutely innocent of the crime charged against him. Logically one crime does not prove another, nor tend to prove another. That is the reason for this rule. However, the rule is not without exceptions. Evidence of other crimes may be allowed under certain exceptions. One exception being the identity of the person charged with the commission of the crime on trial. Now I have allowed this evidence as to the prior record and as to the fact he was on parole to come in only and to be considered by you only, and I stress this, I allowed it to come in only, and to be considered only by you on the question of identification. I specifically point this out to you because you have probably been instructed or will be instructed if a defendant takes the witness stand, even then if it comes out he has been accused of the crime, that prior convictions are to be considered then only as they affect his credibility and the Judge will instruct you again, that you are not to convict a person upon things he has done in the past for which he has been tried and for which he has paid the penalty. But you are only to consider them insofar as this case as it relates to the identity of the individual under all the facts and circumstances of this case. Again, the law is clear when a man is put upon trial for one offense he is to be convicted by evidence which shows he's guilty of that offense

alone, and under ordinary circumstances as I said before proof of guilt of one or other offenses is wholly excluded, because as I said before you cannot convict this defendant or any other defendant upon things he has done in the past, for which he has been tried and paid the penalty. The only reason that the evidence was allowed to be presented to you in this case was as to, one, his parole and two, his past convictions, that you may consider it only as bearing upon the question of identity. As I pointed out to you, there has been the question of identity raised by counsel."

## Decision

We do not accept appellant's argument that the use of the relevant part[4] of appellant's prior record did not qualify under the identity exception. To the contrary, it would appear that if there is purpose to that exception, the circumstances here were molded to fulfill that purpose. Although no limiting instruction is a guarantee that all jurors can erase the hostile "guilty in one, guilty in all" feeling evidence of prior conviction may evoke, we find the actual need for the evidence of the other crimes, in the light of ". . . the other evidence available to the prosecution, the convincingness of the evidence [from] the other crimes . . ." that the accused was the actor [there] and the strength . . . of the other crime's evidence in supporting the [identity of the assailant] . . ." far outweighs "the degree to which the jury [would have probably been] raised by the evidence to overmastering hostility." McCormick, *supra,* stated more succinctly the necessity for and probability of verifying the assailant's identity far outweigh the chance of prejudicial irrelevancy.

*Judgment affirmed.*

---

4. Apparently a record of an additional conviction unrelated as corroboration of the victim's conversation with appellant, was held in reserve for impeachment purposes had appellant elected to testify, but was not offered or introduced for identity purposes.